1
2
3
4
5
6
7                      UNITED STATES DISTRICT COURT

8                 FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   KIRK DOUGLAS WILLIAMS,                    No.  2:09-cv-2968 JAM CKD P

11                  Petitioner,

12        v.                                   FINDINGS AND RECOMMENDATIONS

13   KEN CLARK,

14                  Respondent.

15

16

17        Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  This action proceeds on the First Amended Petition filed October

19   27, 2011.  (ECF No. 56 ("Ptn.").)  He challenges a 2006 judgment of conviction in the

20   Sacramento County Superior Court for felony spousal abuse and related charges, for which he

21   was sentenced to a total of fifteen years and eight months in prison.  Respondent has filed an

22   answer to the petition, and petitioner has filed a traverse.  (ECF Nos. 85, 104.)  For the reasons set

23   forth below, the undersigned will recommend that the petition be denied.

24                              BACKGROUND

25   I.  Facts

26        In its affirmation of the judgment on appeal, the California Court of Appeal, Third

27   Appellate District, summarized the evidence at trial as follows:

28
                                    1

In the early morning of April 16, 2006, Martin Crosby, a deputy sheriff, was patrolling La Rivera Drive when he saw a woman at a pay phone. She appeared distressed; she had no shoes on and her dress was torn. The woman was calling 911 to report that her husband, defendant, had beat her.

Deputy Crosby took the woman, Vani Williams, to her apartment. Her two children were there, but not defendant. Deputy Crosby found several things that corroborated Vani's story. She told him defendant beat her with a broom handle and a bat. He found a bent broom handle and a child's baseball bat. Vani reported defendant grabbed the phone and hid it. Deputy Crosby found it stuffed under the couch cushions.

Vani had injuries; Deputy Crosby noticed a black eye, swelling and bruising on both arms and a very swollen left wrist. He arranged for WEAVE, a domestic violence service provider, to interview her and provide shelter.

Vani Williams testified she was married to defendant and they had two children. FN1 On April 15, she planned to take the children to an Easter egg hunt. Defendant did not want her to take their son. When she returned, defendant demanded to know where she had been and with whom. He told her he knew she was cheating. Later defendant called her "[b]itch, whore, low life whore, stupid, ignorant." He beat her on her face and kicked her legs and thighs. She tried to call 911, but defendant pulled the plug on the phone and took it with him. He stopped her from leaving by blocking the doorway.

FN1. Shortly after her testimony began, Vani refused to answer questions and wanted to "plead the Fifth." She did not want to testify against defendant. The tape of her 911 call to police, in which she said her husband was high on cocaine and drunk and beating her, was played to the jury. The court warned defendant against intimidating the witness; deputies saw defendant motion "stop" when Vani was testifying.

Defendant went to the store to get more beer. He told his wife he would beat her up when he finished the beer. He told her he would kill her and that he would hit her with the bat until she could not move. Vani was scared and fell asleep on the couch. She awoke to someone hitting her. Defendant hit her with a broom stick. When defendant went to the bathroom, she ran out to a pay phone. She had a black eye and her arms, legs, chest and feet were swollen. The jury was shown photographs of her injuries.

After the incident Vani went to a safe house with her children. One week later she learned from a niece that defendant was having a garage sale and selling her possessions. She contacted the police to accompany her to her house. Defendant was inside and the police took him into custody.

Vani also testified to prior incidents of domestic violence. On April 2, defendant thought she was cheating. He pulled her into the back

2

room and they hit each other.  When the phone bill came, only defendant could look at it; he checked the bills to see if Vani was calling another man. Defendant took most or all of her public assistance check; when she worked she had to pay defendant to babysit the children.  One morning when she dropped her son off at Head Start, defendant was waiting by her car.  He asked for money. When she said no, he stopped her from getting in the car and pulled her necklace off.  A police officer arrived and chased defendant. Defendant was taken into custody and the necklace was recovered. During October 2004, defendant would call her 20 times a day, "talking crazy."

During defendant's cross-examination of his wife, the jury learned about several restraining orders against defendant and allegations of other misconduct, including an incident where defendant urinated on his wife.  The court cautioned defendant he was reading into the record portions of police reports that were highly incriminating.

Two defense witnesses testified Vani told them defendant threatened to kill her, the children and himself.  Defendant's sister, Cynthia Hill, testified that during a period when Vani had a restraining order against defendant, she came to Hill's house although defendant was there.  Vani did not appear frightened of defendant.  She stuck out her tongue and taunted defendant that he could not come near her.  Hill claimed Vani did not want to testify and said there were a lot of false things in the police report.  Vani said she was pressured by the district attorney.

Hill also testified that defendant came to her house "high as a kite." She had called 911 when defendant was released on bail, telling the operator defendant was on a rampage and going to do damage to his wife.  Tapes of phone calls between defendant and Hill were played.  In one call, defendant tells his sister he has to have plan A or B.  In a worst case scenario, the victim could say the incident happened one week before and there would be no "corpus delexi (sic) because the crime was reported on this date."  In another call, defendant told his sister he had been reading the law and found a case where the witness took the Fifth.  The proceeding was stopped and the witness was granted immunity.  Then she said she lied because she was mad at the defendant and the case was dismissed. He asked his sister, "Do you understand the case I'm telling you about? ... I can't say nothing on these phones but I can just tell you about a case I read."

Defendant's niece provided an alibi for defendant.  She testified defendant and his son were at her house from 10 or 11 o'clock the night of April 15 until the next day.

Defendant also called Elaine Icenhour, a nurse practitioner, as an expert witness, in an attempt to show the bruises on Vani were old. Icenhour testified the black and blue or purplish color of bruises can appear instantly.  The significant swelling indicated a significant amount of soft tissue trauma.  The bruising was in a linear pattern, indicating Vani was struck with a long object. Vani's elevated white blood count was consistent with inflammation and trauma.

Icenhour had no doubt the injuries were from acute trauma.

During the course of the trial, defendant repeatedly violated court orders. The court found him "manipulative and abusive." The court held defendant in contempt on five different occasions.

People v. Williams, 2008 WL 3970537, at **1-3 (Cal. App. 3 Dist., Aug. 27, 2008), also at Lod. Doc. 5.[1] The facts as set forth by the state court of appeal are presumed correct. 28 U.S.C. § 2254(e)(1).

II. Procedural History

Following a jury trial in the Sacramento County Superior Court in 2006, at which petitioner represented himself, he was convicted of four felonies: spousal abuse resulting in a traumatic condition (Cal. Penal Code § 273.5(a))[2]; assault with a deadly weapon (§245(a)(1)); false imprisonment (§ 236); and making criminal threats (§ 422). For purposes of California's Three Strikes law and repeat offender law, the jury also found true a 1979 prior conviction for attempted robbery. (§§ 667(b)-(i)), 667(a).) (Clerk's Transcript (CT) 401-403, 594-97; 1 Record of Transcript (RT) 72a.) The trial court sentenced petitioner to a total of fifteen years and eight months in state prison. (Lod. Doc. 1; CT 706-707; RT 1597-98.)

Petitioner appealed the judgment. On August 28, 2008, the California Court of Appeal, First Appellate District, affirmed the judgment in a reasoned opinion. (Lod. Doc. 5.) On November 12, 2008, the California Supreme Court denied review. (Lod. Doc. 7.)

On June 12, 2008, petitioner filed a habeas petition in the Contra Costa County Superior Court, challenging the validity of his 1979 conviction. (Lod. Doc. 8.) The petition was denied as untimely (Lod. Doc. No. 9), and subsequent petitions raising this claim were denied in the court of appeal (Lod. Doc. No. 13) and California Supreme Court (Lod. Doc. No. 15).

On October 13, 2009, petitioner filed a habeas petition in the Sacramento County Superior Court, Case No. 09F07776, raising sixteen claims, nearly all of which are included in the instant petition. (Lod. Doc. 16.) On November 19, 2009, the superior court denied the petition in a

---

[1] Lodged Documents refer to those documents lodged by respondent on July 12, 2012. (ECF No. 86.)

[2] References are to the California Penal Code unless otherwise indicated.

1    reasoned opinion.  (Lod. Doc. 17.)

2          On January 16, 2010, petitioner filed a habeas petition in the California Court of Appeal,

3    Third Appellate District, Case No. C063844, raising eighteen claims, nearly all of which are

4    included in the instant petition.  (Lod. Doc. 18.)  The court of appeal denied the petition on

5    January 28, 2010.  (Lod. Doc. 19.)

6          On March 24, 2010, petitioner filed a habeas petition in the California Supreme Court,

7    Case No. S18192, raising twenty-one claims, twenty of which are included in the instant petition.

8    (Lod. Doc. 20.)  On November 23, 2010, the California Supreme Court denied the petition with a

9    citation to In re Clark, 5 Cal. 4th 750 (1993).  (Lod. Doc. 21.)[3]

10         On October 23, 2009, petitioner filed a federal habeas petition in this court.  (ECF No. 1.)

11   On June 10, 2010, the court granted petitioner's motion to stay the proceedings pending

12   exhaustion of claims in state court.  (ECF No. 19.)  On October 27, 2011, he filed the operative

13   first amended petition.  (ECF No. 56.)

14                                        ANALYSIS

15   I. AEDPA

16         The statutory limitations of federal courts' power to issue habeas corpus relief for persons

17   in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

18   Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:  An application for a writ of

19   habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not

20   be granted with respect to any claim that was adjudicated on the merits in State court proceedings

21   unless the adjudication of the claim-

22                    (1) resulted in a decision that was contrary to, or involved
                      an unreasonable application of, clearly established Federal law, as
23                    determined by the Supreme Court of the United States; or

24                    (2) resulted in a decision that was based on an unreasonable
                      determination of the facts in light of the evidence presented in the
25                    State court proceeding.

26   _____

27   [3] Petitioner previously filed six other habeas petitions in the California Supreme Court.  He also
     filed other habeas petitions in the superior and appellate courts prior to filing the petitions
28   described above.  (See ECF No. 85 at 24, fn. 2, 3, 4.)

                                              5

1    As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

2  2254(d) does not require a state court to give reasons before its decision can be deemed to have

3  been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).  Rather,

4  "when a federal claim has been presented to a state court and the state court has denied relief, it

5  may be presumed that the state court adjudicated the claim on the merits in the absence of any

6  indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris v.

7  Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear

8  whether a decision appearing to rest on federal grounds was decided on another basis).  "The

9  presumption may be overcome when there is reason to think some other explanation for the state

10  court's decision is more likely."  Id. at 785.

11    The Supreme Court has set forth the operative standard for federal habeas review of state

12  court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable

13  application of federal law is different from an incorrect application of federal law.'"  Harrington,

14  supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000).  "A state court's

15  determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

16  jurists could disagree' on the correctness of the state court's decision."  Id. at 786, citing

17  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "a habeas court must

18  determine what arguments or theories supported or ... could have supported[] the state court's

19  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

20  arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id.

21  "Evaluating whether a rule application was unreasonable requires considering the rule's

22  specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

23  case-by-case determinations.'"  Id.  Emphasizing the stringency of this standard, which "stops

24  short of imposing a complete bar of federal court relitigation of claims already rejected in state

25  court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not

26  mean the state court's contrary conclusion was unreasonable."  Id., citing Lockyer v. Andrade,

27  538 U.S. 63, 75 (2003).

28  /////

1       The undersigned also finds that the same deference is paid to the factual determinations of

2  state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

3  subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

4  decision that was based on an unreasonable determination of the facts in light of the evidence

5  presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

6  2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

7  factual error must be so apparent that "fairminded jurists" examining the same record could not

8  abide by the state court factual determination.  A petitioner must show clearly and convincingly

9  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

10  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable

11  nature of the state court decision in light of controlling Supreme Court authority.  Woodford v.

12  Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state court's ruling

13  on the claim being presented in federal court was so lacking in justification that there was an error

14  well understood and comprehended in existing law beyond any possibility for fairminded

15  disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  Clearly established" law is law that has

16  been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S.

17  120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as

18  clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not

19  permitting state sponsored practices to inject bias into a criminal proceeding by compelling a

20  defendant to wear prison clothing or by unnecessary showing of uniformed guards does not

21  qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

22  The established Supreme Court authority reviewed must be a pronouncement on constitutional

23  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

24  binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

25       The state courts need not have cited to federal authority, or even have indicated awareness

26  of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8.  Where the state

27  courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal

28  court will independently review the record in adjudication of that issue.  "Independent review of

1    the record is not de novo review of the constitutional issue, but rather, the only method by which

2    we can determine whether a silent state court decision is objectively unreasonable."  Himes v.

3    Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

4        "When a state court rejects a federal claim without expressly addressing that claim, a

5    federal habeas court must presume that the federal claim was adjudicated on the merits – but that

6    presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct.

7    1088, 1096 (2013).  "When the evidence leads very clearly to the conclusion that a federal claim

8    was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of

9    the claim.  Id. at 1097.

10   II.  Procedural Bar

11       The court first addresses respondent's contention that most of the twenty-five claims in

12   the petition are procedurally barred.  This argument concerns the twenty claims listed in the

13   instant petition as Claims 1-A, 1-B, 3, 6, 7, and 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21,

14   22, and 23.

15       These twenty claims correspond to the following claims in petitioner's state habeas

16   petition: I-A, I-B, XVII, 2-A, 2-B, III, IV, V, VI, VII, VIII, IX, X(A), X(B), XI, XII, XIII, XIV,

17   XV, and XVI.  (See Lod. Doc. 20.)  As stated above, the California Supreme Court denied this

18   petition on November 23, 2010, with a citation to In re Clark, 5 Cal. 4th 750 (1993).  (Lod. Doc.

19   21.)

20       Respondent argues that nineteen of the instant claims (all except Claim 3) are procedurally

21   barred because they were rejected on the independent and adequate grounds of successiveness

22   and untimeliness.  As a general rule, "[a] federal habeas court will not review a claim rejected by

23   a state court if the decision of [the state] court rests on a state law ground that is independent of

24   the federal question and adequate to support the judgment."  Walker v. Martin, 562 U.S. 307, 131

25   S. Ct. 1120, 1127 (2011).  Procedural default can only block a claim from federal habeas review

26   if the state court, "clearly and expressly states that its judgment rests on a state procedural bar."

27   Harris v. Reed, 489 U.S. 255, 263 (1989).

28   /////

8

1    In denying petitioner's state habeas petition, the California Supreme Court cited <u>In re</u>

2    <u>Clark</u> without pin cites.  (Lod. Doc. 21.)  <u>Clark</u> discusses several procedural bars used by

3    California courts.  One portion of <u>Clark</u> pertains to the state bar on successive petitions, while

4    another concerns the state bar for untimeliness.  <u>See</u> <u>Bodnar v. Davis</u>, 2014 WL 794575, *19-20

5    (C.D. Cal. 2014) (collecting cases).  Only one of these – untimeliness –is clearly an adequate and

6    independent bar for purposes of procedural default.  <u>See</u> <u>Walker</u>, 131 S. Ct. at 1127-31

7    (California's timeliness bar meets "independent and adequate" criteria so as to preclude federal

8    habeas review).

9    The Ninth Circuit has held that "a procedural default based on an ambiguous order that

10   does not clearly rest on an independent and adequate state ground is not sufficient to preclude

11   federal collateral review."  <u>Lambright v. Stewart</u>, 241 F.3d 1201, 1205 (9th Cir. 2001) (internal

12   quotation omitted); <u>see also</u> <u>Koerner v. Grigas</u>, 328 F.3d 1039, 1052 (9th Cir. 2003) (when a state

13   court order invokes multiple procedural bars without specifying which bars are applied to which

14   claims, and the federal court is unable to resolve the ambiguity, the state order will not support a

15   procedural default); <u>Washington v. Cambra</u>, 208 F.3d 832, 833–34 (9th Cir. 2000) (reversing

16   dismissal of habeas petition where California Supreme Court invoked two state procedural bars

17   without specifying which rule applied to which claim and one of the two bars was not an

18   independent and adequate state bar).

19   Respondent argues that "[e]ven if the California Supreme Court's citation to <u>Clark</u> is

20   interpreted as a denial based on successiveness alone, the procedural bar is still independent and

21   adequate."  (ECF No. 85 at 29.)  Respondent also asserts that one claim – Claim 18 – was

22   previously barred for untimeliness.  (<u>Id.</u> at 31)  The court need not resolve these procedural

23   default issues, however, as it will proceed to review petitioner's claims on the merits.  <u>See</u>

24   <u>Lambrix v. Singletary</u>, 520 U.S. 518, 525(1997) (noting that, in the interest of judicial economy,

25   courts may resolve easier matters where complicated procedural default issues exist).

26   /////

27   /////

28   /////

9

1  III.  Petitioner's Claims

2  1-A.  Self-Representation at Trial

3          Petitioner claims the trial court erred when it granted his request to represent himself at

4  trial, as petitioner was visually handicapped.  (Ptn. at 19.)[4]  Petitioner asserts that he is legally

5  blind and cannot read written material without the aid of a magnifier, cannot evaluate trial

6  exhibits or view the participants in the courtroom, and cannot see clearly even with corrective

7  lenses.  (Id. at 20.)  Petitioner claims that the trial court violated his Sixth Amendment right to

8  counsel, as he should not have been permitted to represent himself.  (Id. at 21-22.)

9  A.  Standard of Review

10          Preliminarily, the court addresses the standard of review.  Petitioner first presented this

11  claim in a habeas petition filed in the Sacramento County Superior Court in October 2009.  The

12  superior court denied the claim on procedural grounds and, alternatively, on the merits.

13  Subsequently, the California Supreme Court denied the petition presenting this claim with a

14  citation to In re Clark.

15          If no state court has adjudicated a federal claim on the merits, the federal court must

16  review the claim de novo.  Cone v. Bell, 556 U.S. 449, 472 (2009); see also Pirtle v. Morgan, 313

17  F.3d 1160, 1167–68 (9th Cir. 2002) (holding that de novo standard of review rather than the

18  deferential standard of § 2254(d) applies where state courts never reached merits of habeas

19  claim).  The presumption that a state court has adjudicated a claim on the merits applies "in the

20  absence of any indication or state-law procedural principles to the contrary."  James v. Ryan, 733

21  F.3d 911, 915 (9th Cir. 2013) (quoting Harrington v. Richter, 131 S. Ct. 770, 785 (2011)).

22          Here, by citing In re Clark, the California Supreme Court indicated that it was denying

23  petitioner's claims on state-law procedural principles.  Thus, even though the superior court ruled

24  on the merits of the claims, de novo review is proper.  See Ryan, 733 F.3d at 915; see also

25  Berkley v. Miller, 2014 WL 2042249, *5 (C.D. Cal. April 2, 2014) ("The Court will not disregard

26  the California Supreme Court's procedural denial and look through it to the merits decisions of

27

28  ───────────────
[4] Citations refer to page numbers assigned by the court's docketing system.

1    the San Bernardino County Superior Court and the California Court of Appeal . . . The relevant

2    state decision for purposes of the Court's habeas review is the procedural denial by the California

3    Supreme Court. . . . [Thus the Court will review the[] claims de novo."). But see Conner v.

4    Lewis, 2014 WL 4348460, *2 (N.D. Cal. Sept. 2, 2014) (superior court decision entitled to

5    AEDPA deference where California Supreme Court denied petition on procedural grounds).

6           The mere fact of constitutional error is not by itself enough to justify habeas relief.

7    Rather, on collateral attack a constitutional trial error requires relief only if it "had substantial and

8    injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 113 S. Ct.

9    1710, 1714 (1993).  The Ninth Circuit has held that "the Brecht standard should apply uniformly

10   in all federal habeas corpus cases under § 2254." Bains v. Cambra, 204 F.3d 964, 977 (9th Cir.

11   2000).  Moreover, even on de novo review, factual determinations by the state court are presumed

12   correct and can be rebutted only by clear and convincing evidence.  Pirtle, 313 F.3d at 1168; 28

13   U.S.C. § 2254(e).

14   B. State Court Decision

15          Addressing this claim, the state superior court summarized the relevant facts as follows[5]:

16              a. Background Regarding Reasonable Accommodations

17              The court's underlying file shows no mention by petitioner at any
18              time before May 16, 2006 that he is legally blind and needed
                accommodations.  Indeed, the transcript of the preliminary hearing
                that was held one week before then, on May 9, 2006, shows not
19              only that petitioner failed to make any similar motion, but that
                petitioner fully participated as his own counsel by rigorously
20              questioning witnesses and objecting to testimony, attempting to
                impeach by reading aloud from documents that he was obviously
21              able to read, and making various arguments that cited the contents
                of documents and various cases and statutes.  On page 82 of the
22              reporter's transcript, petitioner stated that he wanted to cite Mills v.
                Superior Court but could barely read the print because it was so
23              small, and asked the judge to read it; however, neither at that time
                nor at any other time did petitioner state that he was having
24              difficulty seeing anything at the preliminary hearing because he is
                legally blind and that he need auxiliary assistance.

25              The court's underlying file shows that petitioner made no mention
26              of needing accommodations until he filed his pretrial motion on

27   ────────────────────
     [5] This summary reflects portions of the record filed as exhibits to the petition.  See Ptn., Exs. E, F.
28   G, H, I, J, K, L, M, and N.

                                              11

May 16, 2006, just one week after the preliminary hearing, for reasonable modification and accommodation of the courtroom. In the motion, a copy of which petitioner attaches to the petition, petitioner claimed to be handicapped, and asked that all documents served on him be in large print, that he be allowed to use a cassette recorder for the purpose of note retrieval, that he be given a daily transcript on the proceedings, that auxiliary aids be installed in the courtroom or alternatively that advisory counsel be appointed, and that he be given more time in the law library. He attached his own declaration under penalty of perjury, attesting that he is legally blind and has been legally blind since birth, and that he had been certified as legally blind within the past year by a licensed physician.

The motion was heard by the "home court," pretrial, on May 18, 2006. The court's blue sheet minute order indicates that Judge Tochterman denied the motion at that time.

One week later, on May 25, 2006, petitioner filed an ex parte motion for a medical examination of himself to establish that he is legally blind and needs reasonable accommodation of the courtroom because he is unable to view the participants. On May 26, 2006, he filed another motion, for funds to purchase a tape recorder to use as notes of the proceeding because he is legally blind, and another motion, for electronic recording or alternatively a daily transcript of court proceedings. On May 30, 2006, he filed a "notice of appeal" with this court, that the court had failed to rule on these motions, and filed a motion for reconsideration of his request for reasonable accommodations due to his being legally blind. Petitioner attaches a copy of each of these motions to the instant petition. The court's blue sheet minute order indicates that on May 30, 2006, Judge Tochterman, sitting in the "home court," denied petitioner's motion for a recording device; the underlying file as well as petitioner's attachments show that Judge Tochterman also wrote "Denied" on the other motions.

Trial commenced on July 25, 2006. The court's yellow sheet minute orders for the trial do not indicate any mention by petitioner that he is legally blind and needed his motions ruled upon until August 1, 2006, the fifth day of trial proceedings, before opening statements were presented and trial testimony was first taken. . . . Petitioner explained to the court that he had made numerous motions in an attempt to obtain accessibility to the courtroom due to his disability but had been repeatedly denied in his attempts. Petitioner then asked for a close-circuit large-screen television so that he could see the demeanor of persons including the jurors. At that time, the court took under submission petitioner's request for accommodation for his disability. . . .

Trial continued the next day, without mention in the minute order of the subject. However, petitioner attaches a copy of another reporter's transcript . . . at which time petitioner further argued for a closed-circuit large-screen television, because a projector was going to be used during the next part of the trial and petitioner claimed that he would not be able to see what would be projected. The court

stated that it would consider the request, but noted that petitioner was nevertheless able to read and had numerous documents in front of him that he frequently read. . . .

Petitioner attaches a copy of [an]other reporter's transcript . . . in which the court informed petitioner that the court had been unaware until recently that petitioner was legally blind because petitioner had been reading and writing, referencing and cross-referencing various files in front of him, reading exhibits and referencing specific paragraphs from those exhibits in asking witnesses to recollect certain matters. The court stated that when the court learned petitioner had a vision problem, the court requested court personnel to assist in figuring out how to assist petitioner, that those persons were working on the matter, and that petitioner's disability did not appear to be as compelling as petitioner would have the court believe. The court also stated that certain testimony was being transcribed for petitioner, and recessed the matter briefly so that court staff could determine what could be done to assist petitioner. Petitioner complained that his previous motions on the matter had been denied and that the present court had become aware of the problem during trial but that the People had now rested and the court still had not addressed the matter. The court responded that petitioner had said nothing during jury voir dire, and that petitioner was not deaf and could hear the jurors' answers, and further, that petitioner had commented on one witness's attire, and that the court believed that petitioner was simply trying to fray the record with every conceivable issue that could be raised on appeal. Petitioner again protested that the People by now had already rested, but agreed to meet with court personnel.

On August 3, 2006, the court issued a written order that petitioner was to have a tape recorder, a fixed camera on the jury and on the witnesses, and that two 19-inch monitors were to be taped to petitioner's counsel table; the ruling noted that this resolution was discussed with petitioner and that petitioner represented that this was satisfactory.

On August 7, 2006, petitioner filed a motion to dismiss, based on the court's failure to rule on his motion for accommodation until after the People had rested at trial. The next day, petitioner asked for a reader for assistance, and later that day the court ordered an ADA coordinator to read transcripts into a tape recorder for petitioner. . . .

Thereafter, the jury convicted him on the charges, and found one prior allegation to be true.

. . .

The reporter's transcript for the preliminary hearing shows no indication that petitioner had any problem in representing himself and fully participating in that proceeding.  . . . As the court noted during trial, petitioner had been fully participating in the trial and appeared to have been fully able to read all documents at his table and ask questions of the witnesses.

1    (Lod. Doc. 17 at 1-5, 7.)

2    C.   Analysis

3         Criminal defendants have a constitutional right to forgo the assistance of counsel and to

4    represent themselves instead.  Faretta v. California, 422 U.S. 806 (1975).  "[T]he right of a

5    criminal defendant to represent himself at trial consists of two fundamental elements.  The

6    defendant must himself control the case presented to the jury, and the jury must perceive the

7    defendant as having such control.  Subsumed in these requirements is the defendant's right 'to

8    control the organization and content of his own defense, to make motions, to argue points of law,

9    to participate in voir dire, to question witnesses, and to address the court and the jury at

10   appropriate points in the trial.'"  Savage v. Estelle, 924 F.2d 1459, 1463 (9th Cir. 1991) (quoting

11   McKaskle v. Wiggins, 465 U.S. 168, 174 (1984)).

12        In Savage, the Ninth Circuit considered whether "a trial court may deny a criminal

13   defendant's right to represent himself at trial where the defendant's severe speech impediment

14   renders him unable to articulate his own defense."   924 F.2d at 1460.  It concluded that the trial

15   court's denial of plaintiff's Faretta right was permissible, as the defendant's disability prevented

16   him from being "able and willing to abide by the rules of procedure and courtroom protocol."  Id.

17   at 1464.  The Ninth Circuit noted:

18
             We are not imposing a requirement that a trial court, in granting a
19           defendant's request to proceed pro se, must consider explicitly
             whether the defendant is physically able to conduct his own
20           defense, any more than it must consider on the record whether the
             defendant was willing to do so. [Footnote omitted.] As described
21           above, this is a case where the Faretta right was denied, not granted,
             and under McKaskle the denial was permissible. We alter not at all
22           the notion that one who exercises his right to represent himself and
             to waive counsel may not later claim that he was denied his right to
23           effective assistance of counsel.  [Citations.]

24   Id. at 1465-66.

25        Here, the trial court granted petitioner's Faretta motion to represent himself at trial, and

26   petitioner never asked to withdraw that motion, even while seeking – and obtaining –

27   accommodations for his visual disability.  Moreover, petitioner was able to read documents,

28   question witnesses, and otherwise fully participate in his criminal trial.   On this record, he has

                                          14

1   shown neither constitutional error nor prejudice.  Thus this claim should be denied.

2   IB.  <u>Lack of Courtroom Accommodations</u>

3       Petitioner claims that the trial court failed to provide "reasonable accommodations" for his

4   visual disability during trial.   He asserts that this violated his rights under the Fifth, Sixth, Eighth,

5   and Fourteenth amendments to the Constitution, but does not specify how his rights were

6   violated.  (Ptn. at 24-33.)

7       Petitioner presented this claim in his state habeas petition, which was denied in a reasoned

8   opinion by the superior court.  Subsequently, the California Supreme Court denied the petition

9   presenting this claim with a citation to <u>In re Clark</u>.  For the reasons discussed above, the

10  undersigned reviews this claim de novo.

11      The state superior court summarized the facts concerning petitioner's request for trial

12  accommodations, as set forth above.

13      The right of an accused in a criminal trial to due process is, in essence, the right to a fair

14  opportunity to defend against the State's accusations.  <u>Chambers v. Mississippi</u>, 410 U.S. 284,

15  294 (1973).  Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.,

16  provides that "no qualified individual with a disability shall, by reason of such disability, be

17  excluded from participation in or be denied the benefits of the services, programs, or activities of

18  a public entity, or be subjected to discrimination by any such entity," including access to the

19  courts.  42 U.S.C. § 12132; <u>Tennessee v. Lane</u>, 541 U.S. 509, 532 (2004) (quoting <u>Boddie v.</u>

20  <u>Connecticut</u>, 401 U.S. 371, 379 (1971)).  In <u>Bogvich v. Sandoval</u>, 189 F.3d 999, 1002 (9th Cir.

21  1999), the Ninth Circuit suggested that a prisoner's ADA claim can sound in habeas corpus if it

22  "raises the specter of a challenge to the validity or duration of confinement."  <u>See, e.g., Kogut v.</u>

23  <u>Ashe</u>, 592 F. Supp. 204, 208 (D. Mass. 2008) (where inmate is barred from good-time credit

24  program because of his disability in violation of Title II, "[s]uch discrimination may form the

25  basis for habeas relief.").

26      Here, after petitioner was able to act as his own counsel in the preliminary hearing, his

27  pretrial motions for accommodations were denied.   After trial began, petitioner renewed his

28  request for accommodations to the trial judge, who took it under submission despite petitioner's

1  apparent ability to read documents, question witnesses, and otherwise conduct his own defense.

2  After the prosecution rested, the trial court ordered that petitioner was to have a tape recorder,

3  fixed cameras on the jury and witnesses, and two large monitors on his counsel table.  The trial

4  court also ordered an ADA coordinator to read transcripts into the tape recorder for petitioner.

5  The jury subsequently found petitioner guilty of the charged offenses.

6       On these facts, petitioner has not shown that his federal right to due process and a fair

7  trial was violated.  Nor has he shown that a lack of visual accommodations from the outset of trial

8  "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 113

9  S. Ct. at 1714.  Thus this claim should be denied.

10  2.  Waiver of Right to Counsel

11       Petitioner claims that the trial court denied his Sixth Amendment right to counsel because

12  the record fails to demonstrate that petitioner knowingly and intelligently waived his right to

13  counsel when he opted to represent himself at trial.  (Ptn. at 128-146.)

14       Petitioner raised this claim on direct appeal in the court of appeal.  (Lod. Doc. 2 at 6-26.)

15  The court of appeal denied this claim in a reasoned decision on August 27, 2008.  People v.

16  Williams, 2008 WL 3970537, at **3-7.  Subsequently, the California Supreme Court summarily

17  denied review of this claim.  (Lod. Doc. 7.)  Because the state courts denied this claim on the

18  merits, AEDPA review is proper.

19  A.  State Court Decision

20       The state court of appeal set forth the relevant facts as follows:

21          At the initial arraignment, defendant was told he was accused of
            inflicting corporal injury, aggravated assault, and false
22          imprisonment.  FN2 He was also told he had the right to an
            attorney. When the court asked if he could afford an attorney,
23          defendant responded, "Your Honor, I would like to assert my right
            under People versus Faretta." Defendant also waived formal
24          reading of the complaint.

25          FN2. The complaint was amended to add the charge of criminal
            threats. It was later amended to add a strike prior.
26
            The court then advised defendant he had the right to be represented
27          by an attorney and asked if he wanted to give up that right.
            Defendant said yes.  The court advised defendant he faced five
28          years four months in prison and fines and fees up to $20,000.  The

16

court listed several dangers and disadvantages of self-representation. Defendant would be opposed by a trained prosecutor; the judge would not assist him; he would be held to the same standards as an attorney for rules of evidence and procedure; he could unknowingly waive important rights; he might fail to make an adequate record for appeal; he could not argue ineffective assistance of counsel on appeal; he might have difficulty contacting and interviewing witnesses in custody; he might have difficulty phrasing questions to witnesses and arguments to the court. Defendant said he understood all those things.

The court then questioned defendant about whether he was thinking clearly and whether he had been under the care of a mental health professional. The court ascertained that defendant had two years of college and could read and write. Defendant offered that he had represented himself before and the trial resulted in a hung jury. The court cautioned defendant that he could not use his ignorance of the law to justify a continuance.

The court advised defendant of his right to an attorney and the right to appointed counsel if he could not afford one. Defendant then gave up his right to be represented by counsel. The court accepted the waiver of right to counsel as knowing, intelligent and voluntary. Defendant then demanded a speedy trial and a preliminary hearing within 10 days. He waived formal reading of the complaint and pled not guilty. He asked for a copy of the complaint and an investigator so he could issue subpoenas.

This same day, defendant signed a form that set forth the possible penalty of five years four months in prison and fees up to $20,000, and repeated the warnings about the dangers of self-representation. The form stated: "It is generally not a wise choice to represent yourself in a criminal matter." It also advised defendant he had the right to hire an attorney at any time.

At the beginning of the preliminary hearing, the court again advised defendant of his right to an attorney and defendant confirmed he wished to continue to represent himself. After defendant was unsuccessful in calling his six-year-old son as a witness, the court urged defendant to reconsider his decision to represent himself "because dealing with child witnesses, it's a very specialized topic." After defendant was held to answer on the charges, the court raised the issue of his right to an attorney and asked if he wanted to continue to represent himself. Defendant indicated he would change his mind only if he could have a particular attorney, who had represented him before.

On May 12, at the next hearing after the preliminary hearing, defendant was again advised of his right to counsel. The court asked if defendant had money to hire an attorney. Defendant indicated he trusted a particular attorney who represented him before, but that he had a conflict with the public defender's office and had filed lawsuits against them. The court indicated he could not select his appointed counsel. FN3 Defendant raised modification of pro per privileges. The court noted that motion had

been denied and asked if defendant wanted to represent himself. Defendant wanted to stay the proceedings until his writ of habeas corpus was decided. The court told defendant he needed to decide at the next hearing whether he wanted to rely on his habeas petition as the basis for rulings on pro per privileges and attorney representation or whether he wanted a hearing and ruling in the trial court. Before the hearing concluded, the court granted defendant additional time in the law library.

FN3. An indigent defendant has no right to select his appointed counsel. (People v. Ortiz (1990) 51 Cal.3d 975, 986–987.)

At the next hearing, defendant refused to enter a plea, so the court ordered pleas of not guilty be entered. There was no discussion of representation at this hearing. Shortly thereafter, defendant filed a "Notice of Objection Denial of Private Representation." He objected that the court denied his request for private counsel and offered only the public defender. The court denied this motion.

Before jury selection, the court put on the record that it was satisfied defendant had been apprised on his rights pursuant to Faretta. The court noted defendant's potential sentence had been increased because the People had added the allegation of a strike prior. Defendant's exposure had increased to 15 years 8 months. When asked if he still wished to proceed pro per, defendant responded, "Emphatically. Emphatically." FN4

FN4. About two weeks before trial, defendant was arraigned on new charges in another case and indicated he wanted to "waive my right[s] under Faretta." The court advised him it was generally not wise to represent yourself in a criminal matter; he was facing state prison; the court would not help him and he would be opposed by a trained prosecutor; he had to comply with rules of procedure and evidence; he could not claim ineffective assistance of counsel; if he was disruptive, he would be removed and an attorney appointed. The court accepted the waiver.

People v. Williams, 2008 WL 2970537, at **3-4.

Turning to the merits of the claim, the court of appeal reasoned:

The Sixth Amendment of the United States Constitution grants a criminal defendant the right to represent himself. (Faretta v. California, supra, 422 U.S. 806, 818.) A defendant must "knowingly and intelligently" forego the right to counsel. (Id. at p. 835.) He must "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation.]" (Ibid.)

"No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation; the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation,

18

including the risks and complexities of the particular case. [Citation.]" (People v. Koontz (2002) 27 Cal.4th 1041, 1070.) "The requirements for a valid waiver of the right to counsel are (1) a determination that the accused is competent to waive the right, i.e., he or she has the mental capacity to understand the nature and object of the proceedings against him or her; and (2) a finding that the waiver is knowing and voluntary, i.e., the accused understands the significance and consequences of the decision and makes it without coercion. [Citations.]" (Id. at pp. 1069–1070 .)

The record, as set forth above, indicates defendant was warned of the dangers and risks of self-representation both orally and in writing.  Nothing suggests defendant was coerced into representing himself; rather, he "emphatically" chose self-representation. Defendant demonstrated considerable legal knowledge, bringing a variety of motions.  Further, he had represented himself at trial before, which supports the conclusion he understood the Faretta advisements. (See People v. Lawley (2002) 27 Cal.4th 102, 142 [relying in part on defendant's experience in prior trials to find waiver knowing and intelligent].)

Defendant contends the Faretta advisements were deficient because the court did not explicitly explain the nature of the charges, the elements of the offenses, and possible defenses.  Such particular advisements are not required.   In People v. Silfa (2001) 88 Cal.App.4th 1311, the court rejected defendant's request to represent himself because it was concerned defendant did not sufficiently understand the elements of the crimes, possible defenses, and possible sentences. The appellate court reversed. "In the instant matter the court found defendant was mentally competent and fully informed of his right to counsel. He had demonstrated that he was literate and understood the dangers of self-representation. Nothing more is required of him in order to exercise his right of self-representation." (Id. at p. 1322; see also People v. Blair (2005) 36 Cal.4th 686, 709, fn. 7 [failure to query defendant on understanding of potential defenses does not invalidate waiver].)

Defendant relies on several federal cases in which defendant's waiver of the right to counsel was not knowing and intelligent. We find those cases distinguishable because in them the defendant was not advised of the dangers and risks of self-representation.   In Fowler v. Collins (6th Cir. 2001) 253 F.3d 244, defendant faced a 46–count indictment. The court did not advise him of any of the dangers or risks of self-representation and encouraged him to waive both reading of the indictment and an explanation of his constitutional and statutory rights.   (Id. at p. 247.)   The Sixth Circuit found the cursory investigation of defendant's waiver — the court asked only once if defendant would represent himself—did not meet Faretta standards. (Id. at p. 250.)

The other federal cases show similarly deficient advisements. In U.S. v. Akins (9th Cir. 2002) 276 F.3d 1141, 1147 [citation omitted], "the trial court provided no warning, either written or oral, of the dangers and disadvantages of self-representation." In U.S. v.

1    Keen (9th Cir. 1996) 96 F.3d 425, 428, the only question the trial
     court asked about defendant's knowledge of the pitfalls of
2    representing himself was whether he was prepared to pick a jury,
     argue a case to a jury, and cross-examine witnesses.  In U.S. v.
3    Stubbs (3rd Cir. 2002) 281 F.3d 109, defendant wanted to discharge
     counsel and represent himself near the end of trial.  Defendant
4    wanted to appear pro se so he could bring certain matters to the
     attention of the jury.  (Id. at p. 119.)  Although the court advised
5    defendant he would have to follow rules of evidence and procedure,
     defendant stated he did not understand.  "Yet, it is clear that Stubbs
6    never understood that proceeding pro se would not allow him to
     inform the jury of anything he could not also inform the jury of if
7    represented by counsel."   (Ibid.)   The Third Circuit found the
     court's failure to elaborate on how rules of evidence and procedure
8    could limit the defense and to warn of the pitfalls of self-
     representation made it unable to conclude defendant knew what he
9    was doing and made his choice " 'with eyes open.' " (Id. at p. 120.)

10   In contrast to these cases, defendant was advised about the dangers
     of self-representation and that it was not wise to represent himself.
11   He was told the prosecutor had the advantage and that he would be
     held to the rules of evidence and procedure the same as a lawyer,
12   without assistance from the court.  He might inadvertently waive
     rights or fail to make an adequate record.  He might have difficulty
13   contacting witnesses and framing questions and arguments.  In face
     of these warnings, defendant was adamant and consistent in
14   wanting to represent himself.  His waiver of the right to counsel
     was knowing and intelligent.

15

16   People v. Williams, 2008 WL 3970537, **4-7.

17   B.  Analysis

18       The Sixth Amendment guarantees a criminal defendant the right to represent himself.

19   Faretta, 422 U.S. at 832.  Waiver of the right to counsel, as of constitutional rights in the criminal

20   process generally, must be a "knowing, intelligent ac[t] done with sufficient awareness of the

21   relevant circumstances."   Iowa v. Tovar, 541 U.S. 77, 81 (2004); see Brewer v. Williams, 430

22   U.S. 387, 404 (1977) (noting that "courts indulge in every reasonable presumption against

23   waiver" of right to counsel).

24       Here, the record shows that petitioner was advised at his arraignment of the "dangers and

25   disadvantages" of representing himself, and informed he had the right to an attorney.  As

26   petitioner affirmed his Faretta request, the court found his waiver of the right to counsel to be

27   knowing, intelligent, and voluntary.  The same day, petitioner signed a "Record of Faretta

28   Warnings" that restated the court's admonitions against self-representation.   At the preliminary

1    hearing, plaintiff was again advised of his right to an attorney and cautioned against representing

2    himself.  He affirmed that he understood the right, and again expressed his wish to represent

3    himself.  At trial, the court determined that petitioner had been fully advised of his right to

4    counsel, informed him of the maximum penalty upon conviction, and again confirmed that

5    petitioner wished to represent himself.

6         Based on the foregoing, the state courts' determination of no constitutional error was

7    objectively reasonable under AEDPA, and this claim should be denied.

8    3.  Trial Court Failed to Re-Advise of Right to Counsel After Preliminary Hearing

9         Petitioner asserts that the trial court only sought a waiver of his right to an attorney before

10   the preliminary hearing, but did not re-advise petitioner of his right to counsel after the hearing, in

11   violation of California law.  (Ptn. at 147-148.)  As "federal habeas corpus relief does not lie for

12   errors of state law," Estelle v. McGuire, 502 U.S. 62, 67 (1991), this claim is not cognizable

13   under § 2254 and should be denied.

14   4.  Jury Instruction Error

15        Petitioner contends that the trial court denied him due process of law when it instructed

16   the jury that it need not find that the offenses were committed on the day alleged in the charging

17   document.  Petitioner argues that, because he relied on an alibi defense and there was evidence

18   that he committed domestic violence against Vani on other days, the jury could have convicted

19   him based on a different incident than the one charged.   (Ptn. at 149-152.)

20        Petitioner presented this claim on direct appeal, and it was denied in a reasoned decision

21   before being summarily denied by the state supreme court.  Thus AEDPA review is proper.

22   A.  State Court Decision

23        The court of appeal addressed this claim as follows:

24            Defendant contends the trial court erred in instructing the jury that
             it need not find the offenses were committed on a particular date
25            (CALCRIM No. 207) where the evidence established the offenses
             occurred late April 15 and early April 16 and defendant presented
26            an alibi defense.  The Attorney General concedes the error, but
             contends it was harmless. We agree.
27
             The information alleged the offenses occurred "on or about" April
28            15.   The evidence, the testimony of Vani and Deputy Crosby,

established the offenses occurred on April 15, after Vani returned from the Easter egg hunt, through early April 16 when she called 911.  Defendant's niece testified defendant and his son were with her from late April 15 until the next day.

Usually, the precise time an offense occurred need not be fixed. (Pen. Code, § 955.)  In accord with this general rule, the trial court instructed in the language of CALCRIM No. 207: "It is alleged that the crimes occurred on or about April 15th, 2006. The People are not required to prove that the crime took place exactly on that date, but only that it happened reasonably close to that day."

There is an exception to the general rule where the time of the offense is material.  (Pen. Code, § 955.)  Where defendant offers an alibi, the time of the offense becomes material and it is error to instruct it is immaterial what day the offense was committed. (People v. Jones (1973) 9 Cal.3d 546, 557, overruled on another point in Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn. 13.)  "An instruction which deflects the jury's attention from temporal detail may unconstitutionally impede the defense. The defendant is entitled as a matter of due process to have the time of commission of the offense fixed in order to demonstrate he was elsewhere or otherwise disenabled from its commission." (People v. Barney (1983) 143 Cal.App.3d 490, 497.) As the bench note indicates, CALCRIM No. 207 should not be given "when the evidence demonstrates that the offense was committed at a specific time and place and the defendant has presented a defense of alibi or lack of opportunity." (Bench Note to CALCRIM No. 207 (2007–2008) p. 40.)

While it was error to give CALCRIM No. 207, such error is harmless where there is no possibility of juror confusion because the evidence focused on a specific date and the evidence of guilt was overwhelming. (People v. Seabourn (1992) 9 Cal.App.4th 187, 194.)  Both of these circumstances are present here, so the error was harmless.

While there was evidence of other instances of domestic violence, the time of the charged offenses was fixed at April 15. The prosecutor made this point clearly in his closing argument. "But what this trial is about is what happened on April 15th. We spent two weeks in trial talking about a number of things, but when it all boils down, the central core issue is what happened that night of April 15th into the early morning first few hours of April 16th."

The case against defendant was very strong as Vani's testimony about the events that night was uncontradicted and corroborated by other evidence.  The 911 call and Deputy Crosby's finding the distraught, disheveled woman confirmed her story, as did the hidden telephone and the bent broom handle. Vani's description of the beating was corroborated by the photographs and the testimony of the nurse about the nature of her injuries. The alibi was suspect because the niece claimed defendant's son was at her home that night and Deputy Crosby testified the son was at the apartment when he arrived with Vani and both children were taken with their

1      mother to WEAVE.

2   People v. Williams, 2008 WL 3970537, **7-8.

3   B.   Analysis

4         In general, a challenge to jury instructions does not state a federal constitutional claim.

5   Engle v. Isaac, 456 U.S. 107, 119 (1982); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir.

6   1983).  To warrant federal habeas relief, a challenge instruction cannot be "merely . . .

7   undesirable, erroneous, or even 'universally condemned,'" but must violate some due process

8   right guaranteed by the fourteenth amendment.  Cupp v. Naughten, 414 U.S. 141, 146 (1973).

9   Even if there is an instructional error, a habeas petitioner is not entitled to relief unless the error

10  "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507

11  U.S. at 637.

12        Here, the state courts concluded that the challenged instruction was erroneous, but the

13  error was harmless in light of the great weight of the evidence against defendant.  The record on

14  habeas review supports this determination, and petitioner has not shown that the erroneous

15  instruction was prejudicial under Brecht.  Thus this claim should be denied.

16  5.   Evidence of Prior Domestic Violence

17        Petitioner asserts that the trial court committed prejudicial error when it admitted evidence

18  of several prior instances of domestic violence between him and his wife, Vani.  He argues that

19  the admission of this evidence violated his Fourteenth Amendment right to due process and

20  cannot be deemed harmless, as the jury might have convicted him "in order to punish [him] for

21  his previous bad behavior."  (Ptn. at 153-157.)

22        Petitioner presented this claim on direct appeal, and it was denied in a reasoned decision

23  before being summarily denied by the state supreme court.  Thus AEDPA review is proper.

24  A.   State Court Decision

25        The court of appeal addressed this claim as follows:

26             Defendant contends the trial court erred and denied him a fair trial
               by admitting other instances of domestic violence by defendant to
27             show his propensity. He contends this evidence should have been
               excluded because there was no evidence he was convicted on the
28             prior offenses, so the jury may have wanted to punish him for them.

                                        23

Further, except for the incident where he stole Vani's necklace, which was corroborated by a police officer, the evidence was uncertain because it relied solely on Vani's testimony and defendant faced the burden of having to defend against these additional acts.

Before trial, the prosecution moved to admit six prior incidents of domestic violence by defendant under Evidence Code section 1109. Five of the incidents involved Vani and occurred within the last three years. The sixth incident involved another victim and occurred in 1992. No evidence about this incident was admitted at trial.

Defendant requested a hearing under Evidence Code section 402 about this evidence. At the hearing, Vani testified that on April 2, 2006, defendant pulled her into the bedroom while drunk and peed on her face.  FN5  In March 2006, defendant forced her to give him her public assistance money; if she refused, there would be a fight. Defendant stipulated to admission of the December 2004 incident where he stole Vani's necklace.   In October 2004, Vani had a restraining order but defendant called her 20 times a day.   He accused her of sleeping with other men and would not let her use the phone at home.  In March 2003, she also had a restraining order, but defendant called every day and called her names.

FN5. The prosecutor had indicated defendant raped Vani in this incident. At trial she testified only that they had a fight and hit each other.

The trial court found Vani a very credible witness and clearly frightened of defendant.   After weighing the prejudicial effect against the probative value as required by Evidence Code section 352, the court ruled the prosecutor could use all the propensity evidence.

At trial, Vani testified about the four incidents in 2004 and 2006.

Evidence Code section 1109, subdivision (a)(1) provides in part: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Admission of domestic violence propensity evidence, subject to the safeguard of Evidence Code section 352, has repeatedly been held not to violate due process.  [Citations to California cases omitted.]

"Under Evidence Code section 352, the court has discretion to exclude relevant evidence '"if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."' [Citation.]   '"The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an

emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' [Citation.] Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s). [Citations.]" (People v. Rucker (2005) 126 Cal.App.4th 1107, 1119.)

"A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion. [Citation.]" (People v. Lewis (2001) 26 Cal.4th 334, 374.) There was no abuse of discretion here; the probative value of the evidence was great, showing defendant's propensity to commit domestic violence, while the prejudicial effect was slight. (See People v. Poplar (1999) 70 Cal.App.4th 1129, 1139.) The evidence was less inflammatory than the charged offenses; the prior acts did not involve the same degree of violence. This significant difference made it unlikely the jury would confuse the issues. The prior acts were recent; two of them occurred only weeks before the charged offenses.   While there was no evidence defendant had been convicted based on the prior acts, there was evidence he was arrested after stealing Vani's necklace, the most serious prior incident.   The jury could infer he was appropriately punished. Finally, the trial court assessed Vani's credibility in a hearing before admitting the evidence.   Evidence of defendant's past conduct may be sufficiently established by the testimony of the victim. (People v. Hoover, supra, 77 Cal.App.4th 1020, 1030.)

People v. Williams, 2008 WL 3970537, **8-9.

B.  Analysis

The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  See Romano v. Oklahoma, 512 U.S. 1, 12–13 (1994).  "A habeas petition bears a heavy burden in showing a due process violation based on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).  The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly."  Dowling v. United States, 493 U.S. 342, 352 (1990).  In Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citation omitted), the Ninth Circuit explained that:

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when

25

1

2

constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

3

4    Even if the trial court erred in allowing evidence to be admitted at trial, petitioner must show that

5    the admission of such evidence had a "substantial and injurious effect on the jury's verdict." See

6    Plascencia v. Alameida, 467 F.3d 1190, 1203 (9th Cir. 2006) (applying Brecht harmless error

7    analysis to claim that admission of evidence was improper).

8         The Ninth Circuit has held that, because the Supreme Court has expressly declined to

9    address whether the introduction of propensity evidence can violate due process, Estelle, 502 U.S.

10   at 75 n. 5, no claim of unfair propensity evidence can succeed. Alberni v. McDaniel, 458 F.3d

11   860, 866–867 (9th Cir. 2006).  Thus the state court's decision was objectively reasonable under

12   AEDPA, and this claim should be denied.

13   6.  Prosecutorial Misconduct

14        Petitioner asserts that the prosecutor engaged in misconduct when he tried to suppress a

15   victim impact statement from Vani at sentencing.  He claims the prosecutor committed additional

16   misconduct when he "surreptitiously made an agreement with [Vani] to not prosecute her because

17   of the false statements made [to] the police and to the court." (Ptn. at 159-166.)

18        Petitioner presented this claim in his state habeas petition, which was denied in a reasoned

19   opinion by the superior court.  Subsequently, the California Supreme Court denied the petition

20   presenting this claim with a citation to In re Clark.  For the reasons discussed above, the

21   undersigned reviews this claim de novo.[6]

22        The superior court set forth the relevant facts as follows:

23

24

25

Petitioner next appears to claim that the prosecutor engaged at misconduct at the judgment and sentencing hearing, in stating that the victim did not want to make a statement at that time when the victim had told petitioner's counsel that she did want to make a statement. . . .

26

27

A statement by the victim was eventually read out loud by the court at judgment and sentencing.  Petitioner fails to show . . . that the victim was prevented from making a statement in person, or that the

28   _____

[6] For the same reason, all remaining claims are reviewed de novo unless otherwise specified.

1    victim even desired to make a statement in person.

2    (Lod. Doc. 17 at 8-9.)

3    Habeas relief is appropriate if a petitioner can establish that a prosecutor knowingly used

4    false evidence to obtain the conviction.  Napue v. Illinois, 360 U.S. 264, 269 (1959); Hayes v.

5    Brown, 399 F.3d 972, 978 (9th Cir. 2005).  Under Napue, "the knowing use of false testimony to

6    obtain a conviction violates due process regardless of whether the prosecutor solicited the false

7    testimony or merely allowed it to go uncorrected when it appeared."  United States v. Bagley, 473

8    U.S. 667, 679, n.8 (1985).  If the false evidence is material — that is, reasonably likely to have

9    affected the judgment of the jury — the defendant's conviction must be reversed.  United States

10   v. Agurs, 427 U.S. 97, 103 (1976) ("[A] conviction obtained by the knowing use of perjured

11   testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that

12   the false testimony could have affected the judgment of the jury.").

13   Here, petitioner meets neither prong of the Napue test.  Rather, he makes conclusory

14   allegations against the prosecutor without showing that any such misconduct, even as alleged,

15   was material to his conviction or sentence.  Thus this claim should be denied.

16   7.  Brady Violation

17   Petitioner asserts that the prosecutor failed to disclose unspecified material that could have

18   been used to impeach Vani's credibility.  Overlapping with Claim 6, above, petitioner further

19   asserts that the prosecution knowingly promoted perjured testimony of a witness.  (Ptn. at 168-

20   173.)

21   The Supreme Court has found the Due Process Clause of the Fourteenth Amendment

22   requires that, upon request, a criminal defendant be provided by the prosecution with all evidence

23   in their possession which is material to guilt or innocence.  Brady v. Maryland, 373 U.S. 83, 87

24   (1963).  Evidence is material if there is a reasonable probability that, had the evidence been

25   disclosed to the defense, the result of the proceedings would have been different.  U.S. v. Bagley,

26   473 U.S. 667, 682 (1985).  To succeed on a Brady claim, a petitioner must establish that the

27   undisclosed evidence was: (1) favorable to the accused, either as exculpatory or impeachment

28

1    evidence, (2) suppressed by the prosecution, either willfully or inadvertently, and (3) material, so

2    that prejudice to the defense resulted from its suppression.  Strickler v. Greene, 527 U.S. 263,

3    281–82 (1999).

4         The accused has suffered prejudice only if the suppression undermines confidence in the

5    outcome of the trial.  Benn v. Lambert, 283 F.3d 1040, 1053 (9th Cir. 2002) (citing Bagley, 473

6    U.S. at 676).  The mere possibility that an item of undisclosed information might have helped the

7    defense, or might have affected the outcome of the trial, does not establish materiality in the

8    constitutional sense.  Barker v. Fleming, 423 F.3d 1085, 1099 (9th Cir. 2005).

9         Like Claim 6, this claim concerns Vani's victim impact statement at petitioner's

10   sentencing hearing.  While petitioner "infers" from her statement that Vani provided perjured

11   testimony at trial, he admittedly lacks "any details of what parts of [Vani's] testimony was

12   perjured[.]"  (Ptn. at 168.)  Nor does petitioner specify what material the prosecutor failed to

13   disclose that was favorable to petitioner's defense.  As petitioner has not made out the elements of

14   a Brady claim, this claim should be denied.

15   8.  Destruction of Court Documents

16        Petitioner contends that a portion of the superior court file was lost or destroyed, denying

17   him meaningful appellate review.  He argues that the state's failure to maintain these unspecified

18   records, which were "expected to play a role in [his] collateral attack on his conviction," denied

19   him his federal right to due process.  (Ptn. at 175-187.)

20        Respondent argues that this claim is unexhausted, as petitioner never presented it to the

21   California Supreme Court.  At any rate, petitioner has made no showing of entitlement to relief

22   under § 2254, as he has not shown, among other things, that the missing documents were

23   exculpatory.  Thus this claim should be denied.

24   9.  Prosecutorial Misconduct: 1979 Conviction

25        Petitioner asserts that the prosecutor offered evidence of a 1979 prior conviction that had

26   since been "nullified" by court order.  Petitioner argues that, by failing to disclose the latter order,

27   the prosecutor committed misconduct, depriving him of due process of law.  (Ptn. at 189-212.)

28        The United States Supreme Court has held that, in general, habeas relief is not available to

petitioners who challenge a fully expired conviction used to enhance a subsequent sentence in a petition brought under 28 U.S.C. § 2254:

> [O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid. If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

Lackawanna County Dist. Atty. v. Coss, 532 U.S. 394, 403–04 (2001) (citation omitted).[7]  Thus, insofar as petitioner seeks to challenge the 1979 conviction as it was used to enhance his sentence, his claim fails.

Moreover, petitioner has not alleged facts sufficient to make out a Brady claim under the standard set forth above.  None of the documents attached by petitioner show that his 1979 conviction was vacated, nor has he shown that the prosecutor intentionally suppressed material evidence.  Thus this claim should be denied.

10. Juror Misconduct

Petitioner asserts that the trial court erred by failing to ensure that the jury was not tainted by a potential juror's comment about petitioner's ability to represent himself.  Petitioner claims this violated his Sixth Amendment right to an impartial jury.  (Ptn. at 214-251.)

The superior court set forth the relevant facts as follows:

> Petitioner next claims that the trial court erred in refusing to voir dire the jury about what the jurors overheard regarding a conversation between the victim and a particular juror that petitioner was going to lose the case. . . .
>
> In support, petitioner attaches a copy of reporter's trial transcript, of the matter being brought to the court's attention.   Petitioner's

---

[7] The Court recognized only two limited exceptions to this general rule: (1) when the alleged constitutional violation in the prior criminal proceeding concerns the failure to appoint counsel in violation of the Sixth Amendment; and (2) when the defendant was not at fault for the delay in seeking relief from the prior conviction, either because the state court refused to rule on the constitutional issue, or the defendant has since obtained compelling evidence of actual innocence that could not have been uncovered in a timely manner.  Id. at 404–06.  Neither exception applies here.

investigator told the court that he had spoken to the victim, who said she had spoken to a tall juror who was not chosen as a juror, and that the juror had told the victim that petitioner was going to lose the case.  The court had the victim come in, who told the court that she had spoken to a potential juror and the juror had asked if petitioner was her husband, she responded yes, and the potential juror said he thought that petitioner would lose the case.  The victim stated that she knew the individual was a potential juror at the time of the conversation, and that potential juror had come up to her and talk to her for awhile.  The victim stated that there were two ladies sitting on the side, and that the potential juror was talking low to her, and that just she and the juror heard their conversation.  The victim said that after lunch, the potential juror approached her again and said hello.  The victim said that the individual was wearing a badge, and described him and said his first name.  From that, the court was able to determine that this was Juror #47.

The court called in Juror #47, who said that he talked to the victim but that it was not about the case, that they talked about Fiji, barbecue, and volleyball, and that when the victim stated that the defendant in the case was her husband, Juror #47 cut off the conversation with the victim and instead talked to the victim's male companion about Fiji cuisine.  Juror #47 stated that before he learned that the woman he was talking to was the defendant's wife, he had even given her his phone number, but as soon as he learned she was the defendant's wife he said he should not be talking to her.  Juror #47 said that he did not have any conversation with any jurors or alternate jurors who had been selected for the case.  Juror #47 denied telling the victim that petitioner would lose the case because petitioner did not know what he was doing.  The court then stated that Juror #47 was not going to be found in contempt, because Juror #47 did not know that the victim was connected to the case and as soon as Juror #47 learned that she was, he concluded the conversation.  The court also found that Juror #47 did nothing improper, that nothing happened that had any potential to taint the jury, and that there was no tainting of the jury.

(Lod. Doc. 17 at 9-10.)

State criminal defendants have a federal constitutional right to a fair and impartial jury. Duncan v. Louisiana, 391 U.S. 145, 149 (1968).  A defendant's Sixth Amendment right to a fair trial is violated when the "essential feature" of the jury is not preserved.  Williams v. Florida, 399 U.S. 78, 100 (1970).   The Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."  Rushen v. Spain, 464 U.S. 114, 118 (1983), citing Smith v. Phillips, 455 U.S. 209, 217 (1982).

/////

30

Here, even assuming a constitutional error, petitioner has not shown he was prejudiced by the juror's comment or the trial court's method of addressing it.  Thus this claim should be denied.

11.  Child Witness

Petitioner claims that the trial court violated his Sixth Amendment right to present a defense when it refused to let petitioner call his six-year-old son as a witness.  (ECF No. 56-1 at 2-49.)  In a preliminary hearing, the court asked the boy a series of questions and determined that he had no relevant testimony.  It further determined that requiring the boy to testify about the disputed events between his parents could be psychologically harmful.  (CT 164-192.)

At trial, petitioner again sought to call his son as a witness.  After hearing petitioner's offer of proof, the trial court concluded that the boy had "nothing relevant" to offer, that investigative reports concluded that the boy "saw nothing," and "there is nothing he would contribute to this."  (RT 1063.)  The trial court further stated that it would not "put this six-year-old through the trauma of even being qualified for the purpose of testifying to something that would be inadmissible."  (Id.)

Even assuming arguendo that there was constitutional error, petitioner has not shown he was prejudiced by the trial court's decision under Brecht.  Thus this claim should be denied.

12-15.  Various Claims

Even on de novo review, petitioner's next claims are essentially frivolous, as he presents no evidence of prejudice under Brecht.  Specifically, petitioner claims that his federal constitutional rights were violated when:

- The trial court did not immediately replace a court-appointed defense investigator who resigned from the case after conflicts with petitioner (Claim 12; ECF No. 56-1 at 51-79);
- The trial court admitted into evidence portions of jail telephone calls between petitioner and Vani, even though petitioner had been unable to listen to them prior to trial; rather, the tapes were provided to petitioner's investigator and, eventually, to petitioner (Claim 13; ECF No. 56-1 at 81-113);
- The trial court limited petitioner's cross-examination of Vani by sustaining objections to

1    three lines of questioning, deemed irrelevant (Claim 14; ECF No. 56-1 at 115-138); and

2    •   Petitioner's access to the jail law library was limited before trial (Claim 15; ECF No. 56-1

3        at 140-151).

4    Even assuming arguendo that petitioner's constitutional rights were violated by one or

5    more of these events, he has not shown that any of them prejudiced the outcome at trial.  Thus

6    these claims should be denied.

7    16.  Admission of Rap Sheet

8    Petitioner next claims that the trial court violated state law by admitting his rap sheet

9    during the bifurcated trial on the prior conviction allegation.  (ECF No. 56-1 at 153-181.)  Even if

10   the trial court violated state evidence law, however, petitioner is not entitled to federal habeas

11   relief on that basis.  See Estelle, 502 U.S. at 67.

12   Insofar as petitioner argues that his federal due process rights were violated, the due

13   process inquiry is whether the admission of evidence was arbitrary or so prejudicial that it

14   rendered the trial fundamentally unfair.  See Romano v. Oklahoma, 512 U.S. 1, 12–13 (1994);

15   see also Claim 5, supra.  Having reviewed the record, the undersigned finds nothing improper

16   about the admission of petitioner's rap sheet, along with a certified record from the Contra Costa

17   County Superior Court, to show that he was convicted of attempted robbery in 1979.  The jury

18   considered this evidence and, after deliberating, found true the allegation that petitioner had been

19   convicted of the 1979 offense.  Thus this claim should be denied.

20   17.  Rap Sheet's Effect on Jury

21   In a related claim (ECF No. 56-2 at 1-9), petitioner argues that, by admitting the rap sheet

22   and allowing the jury to view it, the trial court exposed the jury to other charges on his rap sheet,

23   causing the jurors to be biased against him.  The trial court ruled that only one page of petitioner's

24   rap sheet, listing the 1979 attempted robbery conviction, would be admitted into evidence.  (RT

25   1559t-v.)  That page also noted other 1979 charges against petitioner: defrauding an innkeeper,

26   battery, and burglary.  (ECF No. 56-2 at 9, Ex. GGG.)

27   As to the allegation before them – petitioner's 1979 conviction of attempted robbery – the

28   jury had direct evidentiary support from the rap sheet and certified record.  Petitioner's theory

1   that the jury was influenced by the other charges is mere speculation, and does not show that the

2   trial was rendered "fundamentally unfair." Thus this claim should be denied.

3   18.  Prior Conviction Invalid

4        Petitioner asserts that he pled guilty to attempted robbery in 1979 because he was without

5   counsel and lacked a full understanding of the consequences of his plea. He argues that the Three

6   Strikes sentence enhancement based on the 1979 conviction is therefore invalid. (ECF No. 56-2

7   at 11-20.)

8        As discussed above, habeas relief generally is not available to petitioners who challenge a

9   fully expired conviction used to enhance a subsequent sentence. Lackawanna, 532 U.S. at 403-

10  04. The two exceptions to this rule are: (1) when the alleged constitutional violation in the prior

11  criminal proceeding concerns the failure to appoint counsel in violation of the Sixth Amendment;

12  and (2) when the defendant was not at fault for the delay in seeking relief from the prior

13  conviction, either because the state court refused to rule on the constitutional issue, or the

14  defendant has since obtained compelling evidence of actual innocence that could not have been

15  uncovered in a timely manner. Id. at 404–06.

16       Here, petitioner asserts that he was not informed of his right to counsel or other procedural

17  rights when he pled guilty to attempted robbery in 1979, though when he sought to withdraw his

18  plea, the trial court appointed counsel. (ECF No. 56-2 at 11-13.) Even assuming arguendo that

19  these allegations meet petitioner's burden to show a Sixth Amendment violation, he has not

20  shown that his lengthy delay in seeking relief was justified. In his June 2008 petition to the

21  Contra Costa County Superior Court, petitioner challenged the validity of his 1979 conviction.

22  (Lod. Doc. 8.) The superior court denied the claim for untimeliness, stating: "Petitioner has made

23  no showing or even attempt to show a reason to justify the 29-year delay in bring[ing] the instant

24  petition." (Lod. Doc. 9.) The claim was subsequently denied by the court of appeal without

25  comment, then by the state supreme court with a citation to In re Clark, 5 Cal. 4th 750. (Lod.

26  Docs. 13, 15.)

27       As petitioner has not satisfied the two-part exception to the Lackawanna rule in

28  challenging his 1979 prior conviction, this claim should be denied.

1    19. Application of Cal. Penal Code § 654

2          Petitioner asserts that the trial court failed to properly apply Cal. Penal Code § 654 when it

3    did not stay his sentence for the counts of false imprisonment and making criminal threats.

4    (Claim 19; ECF No. 56-2 at 22-27.)

5          This claim does not provide a basis for federal habeas relief.  Although petitioner contends

6    that his sentence violates federal due process and equal protection, his claim is essentially a

7    challenge to the trial court's application of California Penal Code § 654.  See Langford v. Day,

8    110 F.3d 1380, 1389 (9th Cir.1996) (stating that a petitioner "may not transform a state-law issue

9    into a federal one merely by asserting a violation of due process.").  Moreover, the specific claim

10   advanced by petitioner is not cognizable in federal habeas proceedings.  Watts v. Bonneville, 879

11   F.2d 685, 687 (9th Cir.1989) (rejecting as not cognizable in a federal habeas proceeding a claim

12   that the imposition multiple sentences for single act violated California Penal Code § 654).  Thus

13   this claim should be denied.

14   20.  Hearing on Contempt Motion

15         Petitioner asserts that the trial court erred by failing to conduct a hearing on his motion to

16   hold the Sacramento County Sheriff in contempt of court.  Petitioner further asserts that, as the

17   trial court held him in contempt of court several times, it was biased against him.  (ECF No. 56-2

18   at 29-52.)

19         Federal habeas relief is available only to people who are "in custody in violation of the

20   Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  In Baily v. Hill, 599

21   F.3d 976, 978 (9th Cir. 2010), the Ninth Circuit observed that the "in custody" requirement of

22   federal habeas law has two aspects.  First, the petitioner must be "under the conviction or

23   sentence under attack at the time his petition is filed."  Baily, 599 F.3d at 978–979, quoting

24   Resendiz v. Kovensky, 416 F.3d 952, 956 (9th Cir. 2005).  Second, section 2254(a) "explicitly

25   requires a nexus between the petitioner's claim and the unlawful nature of the custody."  Baily,

26   599 F.3d at 980.  Here, there is no nexus between petitioner's claim and the allegedly unlawful

27   nature of his custody.  Thus this claim should be denied.

28   /////

1    As to petitioner's argument that the trial judge was biased against him, petitioner cites

2    only the fact that the trial court held him in contempt of court.  As he offers no evidence of an

3    "extrajudicial source of bias or partiality," Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir.

4    2008) (internal citations omitted), he has not shown that his due process right to a fair and

5    impartial judge was violated.  See id.  Thus this claim should be denied.

6    21.  Ineffective Assistance at Sentencing

7    Petitioner asserts that the attorney appointed to represent him at his sentencing hearing

8    deprived him of his Sixth Amendment right to effective assistance of counsel.  (ECF No. 56-2 at

9    54-60.)  Petitioner claims his attorney was ineffective in three ways:  First, he failed to cite a

10   particular case in the motion to strike petitioner's prior conviction.  Second, he failed to challenge

11   the prior conviction on the grounds advanced by petitioner.  Third, he failed to mount a

12   "meaningful adversarial challenge" to the prosecution when the issue arose at sentencing that

13   Vani had given perjured testimony, as discussed in Claim 6.  As to this last issue, petitioner

14   claims that had his counsel sought an evidentiary hearing on Vani's alleged perjury, petitioner

15   "would have a record established . . . [of] what part of [Vani's] testimony was in fact perjured[.]"

16   (Id. at 55.)

17   The Supreme Court has enunciated the standards for judging ineffective assistance of

18   counsel claims.  Strickland v. Washington, 466 U.S. 668 (1984).  First, a defendant must show

19   that, considering all the circumstances, counsel's performance fell below an objective standard of

20   reasonableness.  Strickland, 466 U.S. at 688.  To this end, the defendant must identify the acts or

21   omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at

22   690.  The court must then determine, whether in light of all the circumstances, the identified acts

23   or omissions were outside the wide range of professional competent assistance.  Id.  Second, a

24   defendant must affirmatively prove prejudice.  Id. at 693.  Prejudice is found where "there is a

25   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

26   would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to

27   undermine confidence in the outcome."  Id.  See also United States v. Murray, 751 F.2d 1528,

28   1535 (9th Cir. 1985); United States v. Schaflander, 743 F.2d 714, 717-718 (9th Cir. 1984) (per

curiam).

Here, as discussed above, petitioner has not shown any viable claim with respect to Vani's alleged perjury or his prior conviction for attempted robbery. Nor has he shown in this claim that, but for his sentencing attorney's "unprofessional errors," the outcome of the sentencing hearing would have been different. Thus this claim should be denied.

22. Cumulative Error

Petitioner asserts that the trial court's cumulative errors deprived him of his federal right to due process and a fair trial. (ECF No. 56-2 at 63-64.)

Though petitioner has raised numerous claims with regard to his trial, there was only one constitutional error – the faulty jury instruction discussed in Claim 4 – which the state court reasonably deemed harmless in light of the full record. Petitioner cannot show that this single error "cumulatively" prejudiced him or otherwise violated his federal right to a fair trial. Thus this claim should be denied.

23. Ineffective Assistance of Appellate Counsel

Petitioner contends that his appellate counsel rendered ineffective assistance by failing to argue issues that petitioner raised in subsequent pro se habeas petitions (e.g., challenges to petitioner's prior conviction enhancement and claims that petitioner's sentencing attorney was ineffective), and for failing to ensure an adequate record on appeal. (ECF No. 56-2 at 66-70.)

Under the Strickland standard set forth above, and based on the discussion herein of petitioner's claims in his state habeas petition, petitioner has not shown that his appellate counsel's conduct was prejudicial. Thus this claim should be denied.

24. State Habeas Procedures

Petitioner claims that California's habeas procedures are flawed with respect to indigent petitioners, and that as a result, he was unfairly prejudiced. (ECF No. 56-2 at 72-131.)

This claim is not cognizable on federal habeas review, as "[a] petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings." Franzen v. Brinkman, 877 F.2d 26 (9th Cir. 1989). Thus this claim should be denied.

/////

36

1    In sum, the undersigned concludes that petitioner is not entitled to federal habeas relief on

2  any of his claims.

3    Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas

4  corpus (ECF No. 56) be denied and this case closed.

5    These findings and recommendations are submitted to the United States District Judge

6  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

7  after being served with these findings and recommendations, any party may file written

8  objections with the court and serve a copy on all parties.  Such a document should be captioned

9  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are

10  advised that failure to file objections within the specified time may waive the right to appeal the

11  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12  Dated:  March 10, 2015

13  _____
     **CAROLYN K. DELANEY**

14  **UNITED STATES MAGISTRATE JUDGE**

15

16

17

18  2 / will2968.hc

19

20

21

22

23

24

25

26

27

28